Filed 12/23/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEPHANIE A. PLACENCIA, as Cotrustee, etc., <br><br> Plaintiff, Defendant and Respondent, <br><br> v. <br><br> LISA M. STRAZICICH, as Cotrustee, etc., <br><br> Plaintiff, Defendant and Appellant. | G055631 <br><br> (Super. Ct. No. 30-2010-00356226) <br><br> ORDER MODYIFING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is hereby ordered that the opinion filed on November 26, 2019, be modified as follows:

On page 3, second full paragraph, delete the last three words at the end of the last sentence, "is Ralph's estate" and insert the following in their place, "was Ralph at the time of his death, and thus the funds became part of his estate."

On page 3, last paragraph, the second sentence beginning with "First, the funds in the bank" is modified to read as follows:

"First, the funds in the bank account were part of Ralph's estate, to be distributed pursuant to his will, which has not been subject to a probate proceeding."

On page 10, first full paragraph, second sentence beginning with "The financial institution may pay the" is modified to read as follows:

"The financial institution may pay the surviving party according to the terms of the account, but the funds are part of the decedent's estate, and thus the surviving party holds the funds in constructive trust in favor of decedent's heirs and must account for the funds to the administrator of decedent's estate."

On page 10, at the end of the last sentence of the first full paragraph delete the phrase after the word "survivorship," beginning with the words "but Ralph's estate" and replace it with the following:

"but Lisa held the funds in constructive trust in favor of Ralph's heirs."

On page 12, remove the italics from the subheading "*A Will May Furnish Evidence of Intent*."

In the disposition on page 19, the first sentence beginning with "The judgment is reversed" is modified as follows:

"The judgment is reversed as to the ownership of the Franklin Fund account (item 1 of the Final Judgment and Order on Petitions), and the court is instructed to enter a new order declaring that the account became part of Ralph's personal estate at the time of his death, and thus Lisa holds the funds in constructive trust in favor of Ralph's heirs, which are to be determined in a probate proceeding."

There is no change in the judgment.

The petition for rehearing is DENIED.


IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

ARONSON, J.

2

Filed 11/26/19 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEPHANIE A. PLACENCIA, as Cotrustee, etc., | G055631 |
| Plaintiff, Defendant and Respondent, | (Super. Ct. No. 30-2010-00356226) |
| v. | O P I N I O N |
| LISA M. STRAZICICH, as Cotrustee, etc., | |
| Plaintiff, Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David L. Belz, Judge. Affirmed in part, reversed in part and remanded with directions.

Bradley R. Kirk & Associates and Bradley R. Kirk for Plaintiff, Defendant and Appellant.

Bidna & Keys, Richard D. Keys and Howard M. Bidna for Plaintiff, Defendant and Respondent.

\* \* \*

Ralph Placencia died, leaving behind, among other things, a will, a trust, and a joint bank account with an express right of survivorship in favor of one of his daughters, appellant Lisa Strazicich. Prior to his death in 2009, Ralph left clear statements in his will that he did not want Lisa to have the right of survivorship; he wanted the proceeds of the account to go to his trust so it could benefit all three of his daughters.[1] After his death, Lisa refused to relinquish the funds, and both she and respondent Stephanie Placencia, another of Ralph's daughters, both of whom were cotrustees of Ralph's trust, filed petitions in the probate court in their capacity as trustees to determine the parties' respective rights. The court determined that Ralph's intent should prevail and ordered Lisa to account for the funds to the trust. Lisa appealed.

This appeal turns on a close reading of Probate Code sections 5302 and 5303, part of the California Multiple-Party Accounts Law (Prob. Code, § 5100 et seq.; CAMPAL), which governs rights of survivorship in joint accounts.[2] Section 5302, subdivision (a), provides that a joint account entails a right of survivorship "unless there is clear and convincing evidence of a different intent." The commentary to that section makes clear that "the intention to negate survivorship may be shown to have existed *after* the time of creation of the account." (Cal. Law Revision Com. com., 53 West's Ann. Prob. Code (2009 ed.) foll. § 5302, p. 61, italics added.) On the other hand, section 5303 provides that "rights of survivorship are determined by the *form* of the account at the death of a party." (*Id*., subd. (a), italics added.) "Once established, the terms of a multi-party account" including joint tenancies, "can be changed *only* by one of the following methods" (*id*., subd. (b), italics added), which generally require a party to file paperwork with the financial institution. (*id*., subd. (b)(2).) This case presents a difficult question:

---

[1] For purposes of clarity, we use first names because some of the individuals involved share the same last name. No disrespect is intended.

[2] All statutory references are to the Probate Code.

2

Ralph clearly expressed the intent to negate survivorship, but the form of the account included a right of survivorship, and Ralph did not employ one of the methods listed in section 5303 to change the terms of the account.

We harmonize the two statutes by recognizing the explicit distinction drawn in CAMPAL between the actual ownership of the beneficial interests in the account, and the express terms of the account. The distinction allows the court to honor the clear intent of the person who established the account while at the same time offering protection to the financial institution which holds the depository account.

The express *terms* of the account bear particular importance for the financial institution that holds the account: CAMPAL contains a safe harbor that immunizes a financial institution for payments it makes in compliance with the express terms of the account. Nonetheless, CAMPAL recognizes that the beneficial interests in the funds may differ from its express terms. Section 5302 concerns the rules to determine the beneficial interests in the account; section 5303 concerns the express terms of the account. Thus, we hold that the financial institution was correct to pay the funds to Lisa pursuant to the express terms of the account, but the beneficial owner of those funds is Ralph's estate.

We also conclude the court properly relied on Ralph's will as evidence of his intent, notwithstanding section 5302, subdivision (e), which provides that a right of survivorship "cannot be changed by will." That provision merely preserves the nonprobate quality of survivorship rights. The court may still look to the will as an expression of intent to negate survivorship.

However, we reverse on two issues. First, the funds in the bank account belong to Ralph's estate, which has not been subject to a probate proceeding. It was error for the court to award those funds directly to the trust in the absence of a probate proceeding. Second, in light of that reversal, we remand for the trial court to reassess Stephanie's attorney fees.

3

In 1985, Ralph opened what the parties refer to as the Franklin Fund account with an initial deposit of $140,000. Lisa was listed as a co-owner. Lisa's counsel states the paperwork submitted to open the account specifies that it is a joint account with right of survivorship, though the copy in the record is almost entirely illegible. Regardless, Stephanie stipulated that the account was opened as a joint tenancy with right of survivorship. Moreover, an account statement from 2009 addressed to Ralph and Lisa bore the acronym "JT WROS," which appears to stand for joint tenants with right of survivorship.

Lisa, who was 23 years old at the time, had no involvement in opening the fund. Ralph told Lisa that he put her on the Franklin Fund, but never had any other discussion with her about it. Lisa never deposited money into the account, all of which, to Lisa's knowledge, came from Ralph. Lisa never withdrew money from the account during Ralph's lifetime. The account paid dividends, which Ralph took during his lifetime.

Ralph passed away in December 2009. In the months leading up to his death, Ralph had a number of conversations with Henry Rivera, his brother-in-law, which resulted in Henry assisting Ralph to prepare a will and trust, which Ralph executed approximately 11 days before his death. His will left specific directions as to the Franklin Fund account: "Remove Lisa Strazicich as sole beneficiary of my Franklin Fund. I want the beneficiaries to be Lisa Strazicich, Stephanie A. Placencia and Tina R. Placencia, my three daughters. [¶] I want the Franklin Fund to be placed into my trust fund and then be used to pay off the mortgage of my home in Huntington Beach, CA." Henry confirmed that Ralph specifically made these requests in their conversations.

The trust specified that the res would be distributed evenly between Ralph's three daughters, Lisa, Stephanie, and Tina. It specifically disinherited his two sons (one of whom passed away). The trust named Lisa and Stephanie as successor cotrustees after Ralph's death but specified that most important decisions would need Tina's consent as well. At the time of Ralph's death, the trust contained three properties located in California: a residence in Huntington Beach, raw land in Brea, and a residence in Long Beach. Collectively they were valued at approximately $2,215,000.

In January 2010, about a month after Ralph passed away, Lisa transferred the assets of the Franklin Fund account to an account in her name.

In March 2010, Mark Zavala, one of Ralph's sons, filed a petition seeking to invalidate the trust. Ultimately that petition was denied and the validity of the trust confirmed.

Meanwhile, the sisters' relationship grew contentious; they could not reach a consensus on the proper disposition of the trust assets. Lisa was performing most of the work administering the trust. Stephanie testified that she had not performed any role as trustee for the first four years after her father passed away. However, she was consulting with Lisa and Tina on major decisions related to the trust.

In September 2014, Stephanie filed the first of the underlying petitions in her capacity as cotrustee of the trust. She sought an accounting, damages for breach of fiduciary duty, and to remove Lisa as trustee. In December 2014, Lisa filed a petition in her capacity as cotrustee, seeking, among other things, to remove Stephanie as cotrustee, to recover various costs and fees associated with her work administering the trust, and declaratory relief as to the status of the Franklin Fund account. By the time the petitions were filed, most of the property in the trust had been sold and the funds distributed. Only the Long Beach residence and a small bank account were still held in trust.

The court ultimately trifurcated the trial into three phases. The first phase concerned most of the issues on the merits, including the Franklin Fund issue. The second phase dealt with requests for trustee fees, attorney fees, and other litigation costs. The third phase concerned an accounting of the Franklin Fund account.

In the first phase the court concluded Ralph's will, as confirmed by Henry's conversations with Ralph, amounted to clear and convincing evidence that Ralph intended to revoke Lisa's right of survivorship in the Franklin Fund account at the time of his death. Consequently, the court ordered Lisa to account for the proceeds of the Franklin Fund account, with Lisa's share in the trust to be reduced by the amount she owes the trust from the Franklin Fund account.

Also in the first phase, the court rejected several of Stephanie's claims for relief, including: her request to remove Lisa as trustee, her claim that Lisa breached her fiduciary duty by failing to rent the Long Beach residence, her claim for double damages under section 859 for Lisa's refusal to turn over the Franklin Fund account, and her claim that Lisa violated other fiduciary duties.

As to Lisa's other claims, the court granted her request to sell the Long Beach property and distribute the proceeds, granted her request to remove Stephanie as trustee, and rejected her claim of malfeasance against Stephanie.

In the second phase, the court first concluded that Stephanie was entitled to attorney fees. In reaching that conclusion, the court found that Stephanie was acting on behalf of the trust as a trustee, that she prevailed on the Franklin Fund issue, and that the fees she incurred were expended for the benefit of the trust. After reducing what the court found to be excessive hours spent, the court awarded Stephanie $138,580 in fees, and $19,236.46 in costs.

6

Lisa also sought attorney fees, which the court granted in part and denied in part. The court denied Lisa fees to the extent they were incurred in connection with the Franklin Fund issue, but granted her fees in connection with her successful efforts to remove Stephanie as trustee and to sell the Long Beach property. This resulted in a fee award of $95,284 to Lisa, which she does not challenge on appeal.

However, Lisa does challenge the amount of trustee fees the court awarded her. The court awarded her $38,850 for the period of 2009-2017. We discuss the court's ruling in more detail below.

In the third phase, the accounting of the Franklin Fund account, the court found Lisa held a total of $221,006.44 traceable to the Franklin Fund. Lisa appealed from the final judgment that incorporated the court's rulings from all three phases.

## DISCUSSION

*The Franklin Fund Account Does Not Belong to Lisa*

Lisa first contends the court erred by denying her right of survivorship to the Franklin Fund account. We disagree. In reaching the conclusion that Lisa is not entitled to the funds, we address two aspects of the statutory scheme that, at first blush, seem to support Lisa's position: section 5303's restrictions on the methods of altering the terms of a multi-party account, and section 5302, subdivision (e)'s restriction on the use of a will to change a right of survivorship.

### Sections 5302 and 5303

CAMPAL provides a roadmap for joint accounts, and rights of survivorship in particular. Section 5302, subdivision (a) provides, "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent *unless there is clear and convincing evidence of a different intent*."

(Italics added.)  "This section is the same in substance as Section 6-104 of the Uniform Probate Code (1987), except that section 5302 omits the UPC requirement that the intent that there be no rights of survivorship exist *at the time the account is created*."  (Cal. Law Revision Com. com., 53 Wests Ann. Prob. Code, *supra*, foll. § 5302, p. 61, italics added.)  Section 5302 omits the italicized language.  The commentary to section 5302 draws the logical conclusion that, "under Section 5302, the intention to negate survivorship may be shown to have existed after the time of the creation of the account."  (Cal. Law Revision Com. com., 53 Wests Ann. Prob. Code, *supra*, foll. § 5302, p. 61.)

Section 5303, on the other hand, contains the following restrictions:  "The provisions of Section 5302 as to rights of survivorship are determined by the form of the account at the death of a party."  (*Id*., subd. (a).)  "Once established, the terms of a multiple-party account can be changed *only* by any of the following methods:  [¶]  (1) Closing the account and reopening it under different terms.  [¶]  (2)  Presenting to the financial institution a modification agreement that is signed by all parties with a present right of withdrawal. If the financial institution has a form for this purpose, it may require use of the form.  [¶]  (3)  If the provisions of the terms of the account or deposit agreement provide a method of modification of the terms of the account, complying with those provisions.  [¶]  (4)  As provided in subdivision (c) of Section 5405 [payment by the financial institution in accordance with written instructions from a party]."  (*Id.*, subd. (b) (1)-(4), italics added.)  Section 5303, subdivision (c) further provides that withdrawal of funds from the account eliminates rights of survivorship as to the funds withdrawn.

The question we confront is:  What happens when the form of the account includes a right of survivorship, which was not altered by any of the methods listed in section 5303, but the decedent expressed an intent to negate survivorship before passing?  The key to harmonizing these statutes lies in the distinction between the express *terms* of the account and the *beneficial interests* in the account.

8

This distinction is explicitly set forth in section 5201, which provides, "(a) The provisions of Chapter 3 (commencing with Section 5301) concerning *beneficial ownership as between parties* . . . are relevant only to controversies between these persons and their creditors and other successors, and have no bearing on the power of withdrawal of these persons as determined by the *terms* of account contracts. [¶] (b) The provisions of Chapter 4 (commencing with Section 5401) govern the liability of financial institutions who make payments pursuant to that chapter." (*Id.*, italics added.) Sections 5405 and 5402, in turn, provide a safe harbor for financial institutions that pay according to the terms of the account, irrespective of any beneficial ownership interests: "Payment made pursuant to Section . . . 5402 . . . discharges the financial institution from all claims for amounts so paid *whether or not the payment is consistent with the beneficial ownership of the account as between parties*." (§ 5405, subd. (a), italics added.) Section 5402 provides, "Any sums in a joint account may be paid, on request and *according to its terms*, to any party . . . ."

The distinction between the terms of an account and the ownership of beneficial interests is key to interpreting section 5303 because the principal restriction in section 5303 is that "the *terms* of a multiple-party account can be changed only by" utilizing one of the listed methods. (*Id.*, subd. (b), italics added.) Section 5302, by contrast, concerns the beneficial interests as between the parties to the account: "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties *as against the estate of the decedent* unless there is clear and convincing evidence of a different intent." (*Id.*, subd. (a), italics added.) Further evidence that section 5302, subdivision (a), concerns beneficial interests appears a few lines down in subdivision (d). Subdivision (a) concerns joint accounts, subdivision (b) concerns pay on death accounts, subdivision (c) concerns Totten trusts,[3] and subdivision (d) contains the

---

[3] "The term Totten trust describes a bank account opened by a depositor in his own name as trustee for another person where the depositor reserves the power to

9

following catchall: "In other cases, the death of any party to a multiparty account has no effect on *beneficial ownership* of the account other than to transfer the rights of the decedent as part of the decedent's estate." (Italics added.) The fact that the catchall is explicitly framed in terms of the ownership of beneficial interests strongly suggests that subdivisions (a) through (c) also concern the ownership of beneficial interests.

The answer to the question we posed above, therefore, is this: The financial institution may pay the surviving party according to the terms of the account, but the decedent's estate has a claim for the funds against the surviving party. This result achieves the dual aims of (1) honoring the actual intent of the decedent as to the disposition of his assets, and (2) ensuring the financial institution has an ascertainable, objective basis upon which to pay out the funds in a manner that does not subject it to liability. Here, it was proper for the financial institution to pay out the funds to Lisa, as the terms of the account listed her as having a right of survivorship, but Ralph's estate had a valid claim for the funds against Lisa.

The court in *Araiza v. Younkin* (2010) 188 Cal.App.4th 1120 (*Araiza*) reached the same result. There, the decedent had established a checking and savings account naming her stepdaughter as the beneficiary of the account (though without any right of withdrawal during the decedent's lifetime). (*Id.* at p. 1123.) Four years later, the decedent established a living trust, expressly transferred the savings account into the trust, and provided that the savings account was to go to someone else upon decedent's death. (*Ibid.*) Upon decedent's death, the trial court awarded the account to the trust beneficiary. (*Id.* at pp. 1123-1124.) The stepdaughter appealed, contending that the

---

withdraw the funds during his lifetime. If the depositor has not revoked the trust then, upon his death, any balance left in the account is payable to the beneficiary." (*Estate of Fisher* (1988) 198 Cal.App.3d 418, 424.) A Totten trust is a type of multi-party account governed by CAMPAL. (§ 5132.)

10

account was hers because the decedent had not changed the terms of the account pursuant to section 5303. (*Araiza*, at p. 1124.)

The Court of Appeal treated the account as a Totten Trust, which is governed by essentially the same rules as a joint account. (*Araiza*, *supra*, 188 Cal.App.4th at pp. 1124-1125; § 5302, subd. (c).) The court rejected the stepdaughter's argument concerning section 5303, stating, "This narrow reading of the statute, however, fails to harmonize it with section 5302. Section 5302, subdivision (c)(2) provides that sums remaining on deposit in a Totten trust after the death of the sole trustee belong to the person named as beneficiary, 'unless there is clear and convincing evidence of a different intent . . . .' Here, although the signature card for the savings account named [the stepdaughter] as the beneficiary, there is clear and convincing evidence that [the decedent] had a 'different intent' at the time of her death. She established a living trust that expressly stated her intention to give the savings account to [the trust beneficiary]. The trial court properly relied on the living trust to find that [the decedent] intended to change the beneficiary of her Totten trust from [the stepdaughter] to [the trust beneficiary]." (*Araiza,* at pp. 1125-1126.)

The result in *Araiza* is consistent with our analysis here. As between the parties to the account, the decedent's intent prevails.[4]

---

[4]     In allowing rights of survivorship to be negated after the creation of the account, our Legislature chose to treat rights of survivorship in much the same way Totten trusts traditionally operated, which could "'be revoked by the depositor at any time during his lifetime, by a manifestation of his intention to revoke the trust. No particular formalities are necessary to manifest such an intention.'" (*Brucks v. Home Federal S. & L. Assn.* (1951) 36 Cal.2d 845, 851.)

*A Will May Furnish Evidence of Intent*

But can a will supply evidence of the intent to negate survivorship? Section 5302, subdivision (e), states, "A right of survivorship . . . cannot be changed by will." According to Lisa, if a will could furnish evidence of intent, then a will could effectively change a right of survivorship, nullifying this provision. We disagree.

The purpose of section 5302, subdivision (e), is to preserve the nonprobate quality of rights of survivorship, not to create a firewall between a will and a right of survivorship. Section 5304 makes this policy explicit: "Any transfers resulting from the application of Section 5302 are effective by reason of the account contracts involved and this part *and are not to be considered as testamentary*." (Italics added.) The California Law Revision Commission commentary to that section explains the thinking behind this policy: It "avoids the need for a probate proceeding to accomplish a transfer." (Cal. Law Revision Com. com., 53 West's Ann. Prob. Code, *supra*, foll. § 5304, p. 67.) The declaration that a right of survivorship cannot be changed by a will in section 5302, subdivision (e), simply reflects the policy of section 5304. Survivorship rights represent a nonprobate transfer and thus, by definition, are not determined by a will.

But in assessing the decedent's intent, the court should consider all evidence, including evidence of intent expressed in connection with executing a will. To ignore the will would generate artificial results contrary to the decedent's *actual* intent. This result would be inconsistent with the modern trend toward favoring the decedent's intent over formalities. In *Estate of Duke* (2015) 61 Cal.4th 871, for example, our high court abolished the longstanding rule that extrinsic evidence is inadmissible to reform an unambiguous will. (*Id.* at p. 875.) In reaching that result, the court relied on the principle that "the paramount concern in construing a will is to determine the subjective intent of the testator [citations]." (*Id.* at p. 890.) Courts have expressed similar sentiments in the context of trusts. (*See Morgan v. Superior Court* (2018) 23 Cal.App.5th 1026, 1039 [describing the testator's intent as "the all controlling factor"].) Here, too, our ultimate

12

aim is to ascertain the Ralph's subjective intent as to the disposition of his assets. To that end, it would be counterproductive to blindfold the trial court to expressions of intent found in a will.

Although case law on this issue is sparse, we find support for our conclusion in *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882 (*Gardenhire*), which addressed an analogous situation. There, the issue was whether a will could revoke a trust notwithstanding section 15401, subdivision (a)(2), which provides that a revocable trust may be revoked "[b]y a writing (*other than a will*) signed by the settlor and delivered to the trustee . . . ." (*Gardenhire,* at p. 887, italics added.) The trust permitted revocation "by written notice signed by the Trustor and delivered to the Trustee." (*Id.* at p. 886.)

The *Gardenhire* court held that, although a will could not revoke the trust as a testamentary act, it could, nevertheless, fulfill the more mundane role of providing written notice. The court's colorful analysis is worth quoting in full: "[A]lthough the dispositional provisions of a will remain inoperative until the trustor's death, it does not necessarily follow that the will cannot separately and effectively have a present and immediate effect upon delivery, such as notice of intent to revoke. For example, suppose a person writes a will and in it states that he loathes his brother and bequeaths to him a bag of garbage. He then gives the will to his brother. Although the bequest is legally inoperative, the will nevertheless immediately and effectively communicates the person's feelings to his brother. We perceive no logical reason why a will similarly cannot provide immediate and present notice of a trustor's intent to revoke a trust. Indeed, where a trustor unambiguously manifests an intent to revoke, amend, or alter a trust in a will, and where the trustor delivers it to the trustee, who reads it, we believe the trustor's intent must control and be given effect." (*Id.* at p. 891.)

Likewise here, while a will cannot change a right of survivorship as a testamentary act, it may, nonetheless, provide evidence of the account holder's intent during his lifetime.

Given the evidence of Ralph's will, it is beyond dispute that, during his life, he intended to negate Lisa's right of survivorship. And it does not matter that Ralph intended to set up a joint account with right of survivorship when the account was created. As we discussed above, section 5302 was specifically crafted to allow a party's intent *after* account creation to negate a right of survivorship. Ralph's intent, expressed through his will, did so here.

*The Franklin Fund Account is Subject to a Probate Proceeding*

Having negated Lisa's right of survivorship, the question then becomes: What happens to Ralph's interest in the account? The court essentially ordered Lisa to transfer funds directly to the trust. That disposition of the account funds, however, is principally found in Ralph's will, which was never admitted to probate. And in a multi-party account with no right of survivorship, "the death of any party to a multiparty account has no effect on beneficial ownership of the account other than to transfer the rights of the decedent as part of the decedent's estate." (§ 5302, subd. (d).) As the commentary to section 5302 explains, "The rule stated in subdivision (d) applies to an account where there is clear and convincing evidence of an intent not to have a right of survivorship . . . ." (Cal. Law Revision Com. com., 53 West's Ann. Prob. Code, *supra*, foll. § 5302, p. 62.) Arguably, therefore, upon Ralph's death, his interest in the Franklin Fund account became part of his personal estate, which would need to be probated.[5]

---

[5] Ralph's interest consisted of the entire account because all of the money in the account came from him during his lifetime. Probate Code section 5301, subdivision (a) provides, "An account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each, unless there is clear and convincing evidence of a different intent." The California Law Revision Commission commentary explains

14

Given this possibility, we invited the parties to provide supplemental letter briefs on the following question: "Assuming for purposes of your analysis that the court correctly determined that the will provided clear and convincing evidence that the decedent intended to revoke Lisa M. Strazicich's right of survivorship in the Franklin Fund account: Did the court err in ordering distribution of the account directly to the trust, instead of through a probate of the decedent's estate, to be thereafter distributed either by will or by intestacy? (See Prob. Code, § 5302(d), subd. (d).)" Lisa and Stephanie both submitted letter briefs. Lisa contends that if the funds are not to go to her by way of survivorship, then probate is the only other possibility.

Stephanie, however, contends that Ralph's oral statements and written intent in his will operated to transfer ownership of the Franklin Fund account to his trust prior to his death. Her argument begins with the language of the trust, which allows property to be added without the need for a writing: "Additional property may be added to the trust estate at any time by the Trustor . . . by inter vivos or testamentary transfer. Such additions and title to any property so added may be, *but need not be*, evidenced by . . . writings transferring the property to the Trustee." (Italics added.) Moreover, by statute, oral trusts are permitted, provided the oral trust is corroborated and proven by clear and convincing evidence: "(a) The existence and terms of an oral trust of personal property may be established only by clear and convincing evidence. [¶] (b) The oral declaration of the settlor, standing alone, is not sufficient evidence of the creation of a trust of personal property." (§ 15207, subds. (a), (b).) The California Law Revision

_____

this is a change from the usual joint tenancy laws: "The presumption under subdivision (a) that an account belongs to the parties during their lifetimes in proportion to the net contributions by each changed the rule under former law. Under former law, if the joint account provided for rights of survivorship, the account was presumed to be a joint tenancy and each joint tenant was presumed to have an equal interest in the account." (Cal. Law Revision Com. com., 53 West's Prob. Code, *supra*, foll. § 5301, p. 58.) There is nothing in the record that evidences an intent contrary to the rule that, during Ralph's lifetime, ownership was determined by net contribution.

Commission commentary to section 15207 states: "Under subdivision (b), a delivery of personal property to another person accompanied by an oral declaration by the transferor that the transferee holds it in trust for a beneficiary creates a valid oral trust. Constructive delivery, such as by earmarking property or recording it in the name of the transferee, is also sufficient to comply with subdivision (b)." (Cal. Law Revision Com. com., 54 West's Ann. Prob. Code (1991 ed.) foll. § 15207, p. 542.)

The problem is, Ralph never did any of that. Indeed, there is not even a mention of an oral trust in our record, or an oral transfer to the trustee, much less corroborating evidence such as physical delivery or earmarking. Instead, *in a will*, in a section entitled "I hereby make the following specific *bequests*" (italics added), Ralph simply bequeathed the funds to his trust.[6] In the absence of any transfer to Ralph's trust prior to his death, the Franklin Fund became part of Ralph's estate (§ 5302, subd. (d)) and is, therefore, subject to probate administration (§ 7001).

And there may well be live issues in any probate proceeding. We note that Lisa's petition originally contained a cause of action to invalidate the will, which she abandoned before trial, but which raises the specter of a will contest. Also, one of Ralph's sons was disinherited, so he clearly has an incentive to invalidate the will. Accordingly, it would be premature for the court to distribute Ralph's personal estate at this time. (*See Estate of Hart* (1957) 151 Cal.App.2d 271, 280-281 [where title vests subject to the administration of the estate, the right to possession is deferred until the distribution of the estate and is contingent upon the will not being set aside by a contest after probate].) In doing so, the court erred.

---

[6] There is some ambiguity as to whether the funds were bequeathed directly to the daughters or to the trust. We express no opinion on the matter. The parties are free to litigate that issue in any future proceeding.

16

*Fees and Costs*

   Lisa assigns two errors concerning fees and costs: that she was entitled to more trustee fees than the court awarded, and that Stephanie was not entitled to attorney fees paid by the trust.

   Trustee Fees

   Section 15680 provides that where, as here, the trust provides for a trustee's compensation, "the trustee is entitled to be compensated in accordance with the trust instrument." (*Id*., subd. (a).) And where, as here, "the trust instrument does not specify the trustee's compensation, the trustee is entitled to reasonable compensation under the circumstances." (§ 15681.) "'Allowance of compensation rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal in absence of a manifest showing of abuse.'" (*Estate of Gump* (1991) 1 Cal.App.4th 582, 597.)

   Lisa sought trustee fees of $186,900, which was calculated as 1,068 hours spent between 2010 and 2017 at a rate of $175 per hour. The court determined her reasonable rate was $75 per hour, that the amount of hours she claimed was excessive, and that her time sheets were too vague to demonstrate how the time she invested benefited the trust. In its statement of decision, the court awarded Lisa $40,893.75 "for the period of 2009 to 2017." For reasons that are not clear in the record, in the final judgment the court reduced that amount to $38,850.

   Lisa contends the court abused its discretion by awarding her zero fees from 2015 to 2017. The court never explicitly denied her fees for the period of 2015 to 2017, but she infers the court did so by noting that she claimed exactly $40,893.75 for the time period of December 2009 through November 2014. And since that is the exact number the court awarded (initially), the court must have only been compensating Lisa through November 2014.

But that is not what the court's statement of decision says. It says the court awarded $40,893.75 "for the period of 2009 to 2017." We will not infer from the amount the court chose that it was awarding fees for a period less than what it said. We draw all presumptions in favor of the court's ruling, not against it. The court apparently believed that the amount Lisa claimed for a lesser period was a reasonable amount for the entire period. Lisa has not challenged that ruling as an abuse of discretion.

Stephanie's Attorney Fees

In awarding Stephanie her fees, the court first rendered three predicate findings: that Stephanie was acting in her capacity as trustee, that Stephanie prevailed on the Franklin Fund claim (and no other), and that the fees pursuing the Franklin Fund issue were expended for the benefit of the trust. Lisa challenges all three predicates.

Rather than resolve this issue, we deem it prudent to remand the matter to the trial court for another hearing on Stephanie's attorney fees. Her prevailing on the Franklin Fund issue was an essential predicate for awarding her fees. At the time the court made that order, Stephanie had clearly prevailed: the trust was being enriched by over $200,000. Our ruling here, however, potentially undermines that conclusion. It is less clear that the trust will ultimately get that amount. On the other hand, Stephanie was correct in asserting that Lisa did not have a right of survivorship. In view of these circumstances, the court should have an opportunity to exercise its discretion in the first instance as to whether, and in what amount, Stephanie is entitled to fees. We express no opinion on the matter.

18

DISPOSITION


The judgment is reversed as to the ownership of the Franklin Fund account (item 1 of the Final Judgment and Order on Petitions), and the court is instructed to enter a new order declaring Ralph's personal estate to be the beneficial owner of the proceeds of the Franklin Fund account. The judgment is also reversed as to Stephanie's attorney fees (item 4 of the Final Judgment and Order on Petitions). The matter is remanded on those issues for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. Stephanie shall recover costs incurred on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.