Filed 4/8/13  Gatyas v. Trebowski CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARY ANN GATYAS, et al., | H037947 |
| Plaintiffs and Respondents, | (Santa Clara County Super. Ct. No. 1-09-PR164890) |
| v. | |
| JANET D. TREBOWSKI, etc., | |
| Defendant and Appellant. | |

In 2008, during proceedings to dissolve his marriage to appellant Janet Trebowski, Theodore Trebowski[1] revoked a 1999 family trust and executed a revocable trust in his own name.  Six months later, he died.  Appellant sought to invalidate Theodore's revocation and establish her title to the community assets as successor trustee of the family trust. The successor trustees of Theodore's trust, respondents Mary Ann Gatyas and Robert Trebowski, filed a competing petition to establish the estate's ownership of Theodore's interests in real and personal property.  The trial court ruled in respondents' favor and awarded respondents half the proceeds from the sale of the Trebowskis' marital residence in Los Altos Hills.

---

[1] We will refer to Theodore Trebowski by his first name to distinguish him from appellant Janet Trebowski.

1

Appellant seeks reversal, renewing her contention that Theodore's revocation of the family trust was invalid. We find no error, however, and must therefore affirm the judgment.

*Background*

On April 14, 2008, after nearly 45 years of marriage to Theodore, appellant filed a petition for dissolution of the marriage. The family law summons included standard restraining orders, including a prohibition on "creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or an order of the court. Before revocation of a nonprobate transfer can take effect or a right of survivorship to property can be eliminated, notice of the change must be filed and served on the other party."

The "nonprobate transfer" at issue in this appeal pertains to Theodore's revocation of The Trebowski Family 1999 Trust, dated May 6, 1999. The trust contained the Trebowskis' Los Altos Hills home on Greenhills Court and all household and personal assets then possessed or later acquired by either party. Under section 2.2(a) of the family trust, revocation "in whole or in part" was permitted "with respect to community property held in the trust by a written instrument, signed and dated by either Settlor and delivered to the Trustee and the other Settlor."[2]

---

[2] The entire revocation provision of the trust, section 2.2, stated: "Revocation. Any trust created by this instrument shall not be subject to revocation except as follows: [¶] (a) During the joint lifetimes of the Settlors, this trust may be revoked in whole or in part with respect to community property held in the trust by a written instrument, signed and dated by either Settlor and delivered to the Trustee and the other Settlor. On such revocation, the Trustee shall promptly deliver to both Settlors all of the community property referred to in the written revocation which shall continue to be their community property. [¶] (b) A Settlor who transfers his or her separate property to the trust may revoke this trust in whole or in part with respect to such separate property during such

In August 2008, while the parties were working on a division of their seven investment accounts, appellant decided to buy a new house in Contra Costa County. On August 25, 2008 appellant informed Theodore that in order to close escrow on the purchase by her deadline of September 2, 2008, she needed to divide the non-IRA accounts at Morgan Stanley immediately. Appellant expressed her willingness to revoke her half of the trust and waive any claim on it after her portion was transferred out. Theodore, however, stated that he did not want any money moved out of the Morgan Stanley accounts until he could set up a separate trust. Toward that end Theodore arranged meetings with his estate-planning attorneys for September 2 and September 11, 2008. Theodore's family law attorneys had communicated with appellant's attorneys regarding Theodore's need to do his own estate planning before the accounts could be distributed.

Appellant was aware that Theodore was making efforts to complete his estate planning, but she was frustrated by the delay in gaining access to the funds. After discussion with the family court judge, the parties agreed that appellant could use the home equity line of credit for her purchase. Appellant obtained a new closing date of September 15, 2008. Meanwhile, in the family court the parties stipulated to an order that the Greenhills Court residence would be sold.

---

Settlor's lifetime by a written agreement, signed and dated by such Settlor and delivered to the Trustee. On such revocation, the Trustee shall promptly deliver to such Settlor all of such Settlor's separate property referred to in the written revocation which shall continue to be his or her separate property. [¶] (c) The Surviving Settlor may at any time during his or her lifetime revoke the Survivor's Trust in whole or in part by a written instrument, signed and dated by the Surviving Settlor and delivered to the Trustee. On such revocation, the Trustee shall promptly deliver to the Surviving Settlor all of the property referred to in the written revocation. [¶] (d) Any trust created by this instrument which is revocable as provided in this Section may be revoked in whole or in part by an attorney-in-fact under a power of attorney which grants the attorney in fact the power of revocation."

On September 8, 2008, appellant signed multiple forms, each titled "Authorization to Journal Securities or Funds," which authorized a transfer of half the securities and funds from the family trust to Theodore's new trust. Theodore signed those forms on September 11, 2008. That same day, he executed his "Revocation of Trust Agreement and Last Will," in which he revoked, "in its entirety," the 1999 family trust. He also executed his new trust, the Theodore Trebowski Living Trust, which appointed respondents -- his son, Robert Trebowski, and his sister, Mary Ann Gatyas -- as successor trustees. Additional documents, including a pour-over will and assignment of property, were also executed that day.

In the early afternoon of September 11, 2008, Theodore's family law attorney, Colleen Duffy-Smith, sent an e-mail to appellant's family law attorneys, the paralegal at their firm, and appellant's financial advisor at Morgan Stanley, informing them all of the completion that day of Theodore's estate plan and his authorization to split the Morgan Stanley assets. Duffy-Smith attached a copy of Theodore's revocation of the family trust and the prior will. An hour and a half later, Margaret Desmond, a legal assistant to appellant's attorneys, forwarded the e-mail and attachment to appellant. Later that day Sandra Wang, appellant's financial advisor, "[u]pdated" appellant by telephone on "the status of the splits" and discussed the prospect of appellant's "setting up her own trust."

At trial appellant denied receiving the forwarded e-mail from Desmond attaching Theodore's revocation, or any other notification of the event. Theodore told Duffy-Smith that he had given Colantuno the revocation to deliver personally to appellant. However, Caroline Colantuno, the Trebowskis' daughter, testified that her father never gave her anything to deliver to appellant. She also denied being asked by her father whether she had delivered the revocation to her mother. He did give her a box sealed with tape on February 21, 2009. Colantuno put the box in her garage. Appellant testified that she did not receive any estate-planning documents from Colantuno before Theodore's death.

4

Theodore was found dead in his apartment on March 14, 2009. Two days later appellant asked Theodore's estate-planning attorney, Serra Goldman, for a copy of Theodore's estate-planning documents. According to Goldman, she advised appellant that the documents would be provided to the successor trustees. A week later one of appellant's attorneys, Philip Hammer, asked Duffy-Smith for a copy of "Dr. Trebowski's trust and his Will." In a letter shortly thereafter he asked for a formal notification "as to the successor trustee(s) handling Dr. Trebowski's estate," so that he could proceed with a motion regarding the personal property in the parties' home.

On May 1, 2009, pursuant to Probate Code section 16061.7, respondents served appellant and her attorneys with a notice of administration of Theodore's 2008 trust, together with a copy of the trust.[3] The parties had stipulated that the family court had continuing jurisdiction to enforce its prior orders allowing the sale of the Greenhills Court property. Appellant did not file a contest to Theodore's trust within 120 days, as provided by Probate Code section 16061.8. On September 3, 2009, she filed a creditor's claim setting forth the amount she wanted the estate to reimburse her for expenses relating to the Greenhills Court property. In that document she implicitly acknowledged the estate's interest in the property. Between May 14 and early December of 2009 appellant's attorneys submitted multiple requests for reimbursement of expenses appellant had advanced for the property.

On September 21, 2009, citing Probate Code sections 17200 and 17200.1, appellant filed a petition in Contra Costa County for an order declaring Theodore's 2008 revocation to be invalid, confirming her as sole successor trustee of the 1999 family trust, and declaring that she held legal title to the Greenhills Court residence. Appellant

---

[3] Probate Code section 16061.7 requires a trustee to notify the heirs and beneficiaries of a settlor that the settlor has died, converting a revocable trust to an irrevocable status.

asserted that a written revocation of the family trust had not been delivered to her pursuant to section 2.2 of the family trust. Because her marriage to Theodore had not been terminated by a judgment before he died, and because their respective rights to the Greenhills Court property had not been adjudicated, the "Purported Revocation" was invalid and the property remained an asset of the family trust, of which she was the sole successor trustee.

In November 2009, Theodore's attorneys filed a "Notice of Service of Written Notice of Revocation of Trust Agreement and Last Will." This document stated that Theodore had served notice of the revocation on appellant's counsel, "among others," on September 11, 2008.

In December 2009 respondents submitted a petition to establish the estate's ownership of certain property, including the Greenhills Court residence. In their supporting points and authorities, respondents urged the court to find that Theodore's 2008 trust held equitable title to Theodore's real and personal property, which he had been unable to transfer from the family trust to his own name or his individual trust before he died. The petition sought an order directing appellant to transfer the property to respondents as executors of Theodore's will, along with real property located in North Carolina and compensation for personal property appellant had taken from the residence without authorization.

On April 18, 2010, having approved successive reductions in the listing price without notice to respondents, appellant executed an agreement for the sale of the Greenhills Court property, again without notice to or authorization from respondents. Respondents learned of the agreement on April 20, 2010, and 10 days later they filed a lis pendens, which the family court later ordered expunged. Escrow on the property closed on May 18, 2010, and half of the proceeds were placed into a trust account for respondents' benefit.

6

On May 3, 2010, the Santa Clara County Superior Court granted respondents' motion to coordinate appellant's petition with that of respondents and transfer the Contra Costa County case to Santa Clara County. Appellant filed her first amended petition on July 7, 2010.

Trial on the parties' "competing petitions" did not commence until March 14, 2011 in the probate court.[4] The court first granted respondents' motion to amend their answer to appellant's petition in order to include affirmative defenses of waiver, estoppel, unclean hands, and the bar of the statute of limitations, Probate Code section 16061.8. The court then heard testimony and argument on the issue of the effectiveness of Theodore's revocation under Family Code section 2040. Respondents sought to show that appellant received the revocation and knew that it was important not only to Theodore but to her own ability to complete her real estate purchase. After the revocation she used her half of the released Morgan Stanley funds, and continuing beyond September 2009 she and her attorneys "acted as if the revocation was valid." Appellant asserted no claim of full ownership of the Greenhills Court property until late September of 2009. She and her attorneys, for example, had asked for copies of Theodore's trust; they had accepted respondents' September 3 inventory and appraisal claiming Theodore's half interest in the home; and their series of requests for expense reimbursement—even after claiming full ownership-- indicated an assumption that half the property belonged to the estate. Respondents also complained that appellant had removed personal property from the residence, in violation of a specific order of the family court.

---

[4] On July 16, 2010, the family court had stayed the dissolution proceedings to allow the parties to "proceed on their issues in the Probate Court."

The probate court granted appellant's request to bifurcate the revocation issue and try it before the remaining issues in dispute, notably appellant's status as successor trustee of the family trust and that trust's ownership of the Greenhills Court and North Carolina properties. Appellant maintained that the "Purported Revocation" of the family trust had not been "delivered" to her by a "written instrument," as required by section 2.2(a) of the family trust. She testified that she had never received the e-mail from Margaret Desmond forwarding the e-mail attaching the revocation on September 11, 2008. Nor had her daughter Caroline delivered any estate-planning documents to her before Theodore's death.

When appellant rested, respondents moved for judgment on her petition under Code of Civil Procedure section 581, subdivision (c). After taking additional evidence, including appellant's further testimony that she had never received the revocation e-mail, the court granted the motion and proceeded to hear evidence on respondents' separate petition and request for damages for the asserted taking and concealment of personal property belonging to the estate.

At the close of trial on April 15, 2011, the trial court announced its ruling in respondents' favor. The court found that Theodore's 2008 trust and will were valid, and that half the proceeds from the sale of the Greenhills Court residence belonged to his trust.[5] The court further stated that the manner in which the home was sold was "improper," and a "better job could have been done" apprising respondents of the taking of the personal property; but it saw no bad faith or "cynical motive" on appellant's part when she removed personal property and unilaterally made decisions about the marketing of the home; "in all likelihood" appellant was "relying on her lawyers to keep her out of trouble." Accordingly, the court denied respondents' request for damages under Probate

[5] Appellant had relinquished her claim to the North Carolina property.

Code section 859, and it ordered the parties to meet and confer regarding the proper division of the personal property.

In its written statement of decision the court elaborated on its findings. It agreed with respondents that (1) appellant had waived her untimeliness challenge, which was addressed to respondents' failure to file a notice of revocation before Theodore's death; (2) appellant's petition, which contested the validity of the 2008 trust, was untimely under Probate Code section 16061.8; and (3) appellant was estopped to contest the validity of the revocation through her conduct both before and after Theodore's death. Addressing the merits of appellant's petition, the court found that "actual service and delivery" had been made on her on September 11, 2008. The court noted that in 2008 Code of Civil Procedure section 1010.6 did not require any particular method of agreement to accept service by e-mail.[6] Here, appellant had "manifested an agreement to accept service of the Revocation by email, and that service of the Revocation was properly made on [her]." Further, "to the extent that email service was not authorized by statute, Janet Trebowski waived any irregularity." Finally, the court observed that the revocation had not "remotely affect[ed] any part of Janet Trebow[s]ki's one-half interest in the marital estate. It only affected Dr. Trebowski's one-half interest in the marital estate and, at the time it was signed, she did not care what he did with his one-half interest."

The final disposition awarded respondents half the proceeds from the sale of the Greenhills Court property, all of Theodore's separate personal property, and a one-half

---

[6] Former Code of Civil Procedure section 1010.6, subdivision (a)(6) provided, in pertinent part: "Where notice may be served by mail, express mail, overnight delivery, or facsimile transmission, electronic service of the notice and any accompanying documents may be authorized when a party has agreed to accept service electronically in that action."

interest in the community's personal property. From the ensuing judgment on December 22, 2011, appellant brought this timely appeal.

*Discussion*

*1. Notice of Theodore's Revocation*

Appellant renews her challenge to the validity of Theodore's 2008 revocation of the 1999 family trust. She asserts two grounds for reversal. First, under the automatic temporary restraining orders (ATROs) issued as part of the dissolution petition, Theodore was restrained from "creating a nonprobate transfer or modifying a nonprobate transfer in a manner that affects the disposition of property subject to the transfer, without the written consent of the other party or an order of the court." (Fam. Code, § 2040, subd. (a)(4).) Appellant emphasizes that the exception to this restriction under subdivision (b)(2) applies only if notice of the revocation is "filed and served on the other party."[7] That exception was inapplicable here, appellant argues, because Theodore's revocation of the 1999 trust had not been filed and served before September 11, 2008, or even before Theodore's death. In appellant's view, a "bright-line" construction of this statute is necessary to promote "predictability, reduced litigation, efficient judicial administration, faster resolution of disputes, and disposal at a pretrial stage." It "would then be perfectly clear what type and manner of notice 'must' be given before a trust revocation could take effect and the consequences of giving or not giving such notice." Consequently, nothing less than "an actual 'filing' and 'serving' " should be deemed sufficient to make the revocation valid.

---

[7] This provision of Family Code section 2040 states: "(b) Nothing in this section restrains any of the following: [¶] (1) Creation, modification, or revocation of a will. [¶] (2) Revocation of a nonprobate transfer, including a revocable trust, pursuant to the instrument, provided that notice of the change is filed and served on the other party before the change takes effect. . . . "

10

To accept appellant's position, however, would mean invariably disregarding a party's *actual knowledge* that the other party has revoked his interest in a trust.  This is such a case.  The trial court determined that appellant had actual notice of the revocation, which served the dual objectives of releasing his interest in property he wished to transfer into his own trust and allowing appellant to access the remaining funds for her real estate purchase.  Thus, the trial court expressly found that appellant "at all times knew of his intention to revoke his interest in the 1999 Trust, knew of the Revocation, and did not object while he was alive."  Not only was appellant aware of the revocation both before and after its completion, but a copy of the executed document was provided to her.  To ignore these facts -- which appellant does not challenge as unsupported by substantial evidence -- in favor of appellant's proposed strict enforcement of Family Code section 2040, subdivision (b)(2), would elevate hypertechnical applications of statutory procedure to new heights without serving the legislative purpose of protecting the property rights of both parties during dissolution proceedings.[8]  This conclusion is only reinforced by the trial court's observation that, unlike the cases on which appellant relied, the revocation had not even "remotely" affected appellant's half of the Trebowskis' community property.  Indeed, noted the court, quoting *Estate of Mitchell* (1999) 76 Cal.App.4th 1378, 1394, Theodore "did nothing 'that would injure or dissipate the property of the marital estate' or 'that would place the property beyond the power of the court thus preventing the court from allocating the property in its final decree.' "

_____

[8] In her reply brief, appellant belatedly argues that she had not agreed to electronic service of notice, as outlined in California Rules of Court, former rule 2.260 (now rule 2.251).  This citation does not dispel the existence of actual notice.  Moreover, appellant's quotation of the former rule is incomplete; in 2008 it stated, "When a notice may be served by mail, express mail, overnight delivery, or fax transmission, electronic service of the notice is permitted."  (Cal. Rules of Court, former rule 2.260(a)(1).)

11

At trial appellant clearly stated that she needed her half of the non-IRA accounts to enable her to complete the purchase of her new home before escrow closed. She understood (and told Sandra Wang, her financial advisor) that Theodore would not authorize the division of the Morgan-Stanley funds until he had set up his new estate plan and a new trust in which to deposit his half of the funds.[9] At that time she "was not interested in what he was doing" about estate planning. She "didn't care" what he did with his half of the community property but simply wanted everyone to "hurry up so [she] didn't miss the closing." Wang's notes indicated that appellant was willing to revoke her own half of the 1999 trust in order to facilitate the release of the funds she needed. Appellant's professed belief that Theodore could transfer property into a new trust without revoking his interest in the old one was implicitly rejected by the trial court as not credible.[10] The court also appears to have perceived an inconsistency between appellant's opposition to the revocation (and concomitant assertion that title to the Greenhills Court home belonged to her) and her implicit acknowledgement -- particularly through her creditor's claim and requests for reimbursement -- that half of the Greenhills Court property belonged to Theodore's estate. The appellate record fully supports these findings.

---

[9] Appellant's attorneys had resisted delay caused by "estate planning" by pointing out that they had offered "a reasonable and viable option, in the form of a revocation of the trust and a waiver of Janet's interest in the trust."

[10] Appellant testified that while she understood that Ted was trying to set up his own trust, that "did not mean that he was taking away from [the] original 1999 trust."

12

## 2. *Compliance with the 1999 Trust*

Appellant contends that Theodore's revocation never became effective because he did not comply with section 2.2(a) of the trust instrument.[11] She concedes that her attorneys forwarded to her the e-mail containing Theodore's revocation; but this method, she maintains, was not authorized by the terms of the family trust, nor could the Trebowskis have contemplated e-mail as an acceptable method of delivery in 1999 when they executed the trust instrument.

Although unnecessary to the disposition of this issue, we note in passing the trial court's finding that waiver and estoppel precluded appellant's challenge to Theodore's revocation. Respondents had argued that appellant's conduct conveyed an implied assent to or ratification of the revocation: she knew about Theodore's intent before it took place, she used it to her own advantage by receiving her half of the Morgan Stanley funds, and she and her attorneys "acted as if the revocation was valid through and past September 2009." The trial court agreed with respondents' position, finding that waiver and estoppel were applicable here.

Appellant does not dispute the factual support for these findings; instead, she protests that the court's ruling on respondents' affirmative defenses was improper because respondents had failed to raise waiver or estoppel in their motion for judgment. She also maintains that because the "file and serve" requirement of Family Code section 2040, subdivision (b)(2), is a bright-line rule, it forecloses any application of these judicial doctrines.

---

[11] Probate Code section 15401 permits revocation by *any* of the methods listed in that section, including "[b]y compliance with any method of revocation provided in the trust instrument." Accordingly, if Theodore's revocation was permissible under the terms of the family trust, it is sufficient under Probate Code section 15401.

13

Were we to address those equitable principles on the merits, we would agree with the trial court that appellant acquiesced in or ratified the revocation through her conduct and that of her counsel both before and after Theodore's death, thereby waiving any procedural infirmities. She acknowledged the estate's claim on half of the Greenhills Court property by requesting contributions toward its expenses and even filed a creditor's claim in early September of 2009 without disputing the estate's interest in the home. As to appellant's second complaint, respondents aptly point out that appellant did not specifically oppose the application of waiver or estoppel in her objections to the proposed statement of decision.

In any event, even disregarding the applicability of respondents' affirmative defenses, we must uphold the lower court's determination that Theodore complied with the revocation provision of his trust. Section 2.2 of the family trust explicitly stated that revocation was not permitted except under specified conditions. As noted earlier, section 2.2(a) provided for one of those conditions, as follows: "During the joint lifetimes of the Settlors*, this trust may be revoked in whole or in part with respect to community property held in the trust by a written instrument, signed and dated by either Settlor and delivered to the Trustee and the other Settlor*. On such revocation, the Trustee shall promptly deliver to both Settlors all of the community property referred to in the written revocation which shall continue to be their community property." (Italics added.)

Appellant correctly observes that this provision states the exclusive method for accomplishing a revocation that affects the disposition of community property. (See *Masry v. Masry* (2008) 166 Cal.App.4th 738, 742-743 [where trust provision provided nonexclusive method of revocation, settlor could rely on Probate Code section 15401 to accomplish revocation]; see also *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888 [revocation by will authorized as trust did not restrict method of "written notice"]; cf. *King v. Lynch* (2012) 204 Cal.App.4th 1186, 1193 [modification method

14

specified in trust binding notwithstanding more liberal statutory procedure].)  Unlike appellant, however, we do not read into section 2.2 a requirement that the written instrument must be given to the recipient personally or sent by postal service in order to constitute a valid delivery.  Appellant urges this court to use Probate Code section 1217 to interpret the word "delivered."  That statute provides: "If a notice or other paper is required to be served or otherwise given and no other manner of giving the notice or other paper is specified by statute, the notice or other paper shall be mailed or personally delivered as provided in this chapter."

We see no indication that the parties were relying on Probate Code section 1217 to give meaning to the word "delivered."  Had they wished to specify acceptable methods of delivery, they could have done so in the trust instrument itself, by inserting terms similar to those of Probate Code section 1217 or by directly adverting to that statute.  There is no indication, however, that the parties intended to restrict the word "delivered" to the meanings accorded to "served or otherwise given" in Probate Code section 1217.  The trial court thus properly found that "the Revocation was delivered to Janet Trebowski in compliance with Section 2.2(a) of the 1999 Trust."

In summary, no error appears in the trial court's findings that appellant had adequate notice of Theodore's revocation of his interest in the 1999 family trust, and that she acted in accordance with the revocation without challenge until her September 21, 2009 petition in Contra Costa County.[12]  We likewise uphold the lower court's ruling that revocation was "delivered" to appellant in a manner consistent with the trust instrument.

*Disposition*

The judgment is affirmed.

---

[12] We need not reach the additional issue of whether appellant's September 2009 petition was a "contest" of Theodore's 2008 trust and therefore untimely under Probate Code section 16061.8.

15

_____

ELIA, Acting P. J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MÁRQUEZ, J.

16